Good afternoon, Illinois appellate court first district court is now in session, the sixth division, the Honorable Justice Mary l make for presiding case number 17 dash 2005 people versus Garcia. Thank you, Darren console welcome. Before we begin and before we start timing you I'd like you to please introduce yourselves, tell us who you're going to represent. And for the appellant, please let us know if you want to reserve any of your 20 minutes for rebuttal. So beginning with the appellate. Good afternoon, Your Honors, I'm assistant appellate defender Matthew Daniels, I represent the appellant Daniel Garcia, I'd be asking to reserve five minutes for rebuttal. Of course. Good. Excuse me. Good afternoon. I'm Lisa Morrison. I'm an assistant state's attorney and I represent the people of the state of Illinois. All right, Mr Daniels whenever you're ready. Thank you. May it please the court counsel, Daniel Garcia was convicted of serious offenses, and his sentence will keep him in prison until he is at least 112 years old. But those convictions and that sentence should not stand for two reasons. First, Daniels trial was unfair because the jury didn't know that he was intellectually disabled, and that evidence wasn't presented until after trial, and Daniels intellectual disability was vital to understanding his demeanor and assessing his credibility. Second, on this record, an aggregate sentence of 100 years was excessive, or the trial court offered 36 years during a pre trial rule for to conference. Accordingly, this court should grant Daniel a new trial or grant him sentencing relief. Emphasize if you will without abandoning your argument that he should be get a new child just to save some time for the second issue because that is a particular interest to us. Sure, and if you're honest wish I can go right to that right now. We understand. What I'd like to focus on regarding the sentencing arguments we've made is the excessive sentence issue, they raised that issue to be of our briefs. Under that particular argument, our argument is that the trial courts impose an excessive sentence in giving Daniel that 100 year sentence. That was an abuse of discretion. As I said a moment ago, during pre trial proceedings, the trial court offered Daniel 36 years imprisonment for the same four counts that he ended up going to trial and getting convicted of. And yet we have an ultimate sentence here, that is 100 years. That's quite a disparity it's almost three times what the trial court offered. So isn't it correct that sometimes what happens is that after the judge has heard all the evidence at trial, and heard all of the victim impact statements and so forth, that that can sometimes change the judges mind regarding sentencing. It can Your Honor and I acknowledge that just because the trial judge offered 36 years at the real 402 conference, it doesn't mean that he was required to give him only 36 years, I understand that a plea offer has implicit within it. The fact that court resources are being saved, that witnesses don't have to come in, and so on and so forth. And I also acknowledge that with respect to the judge, learning new information, either at the trial or at sentencing, that can be a basis for increasing the sentence above what was offered at a 402. But two things to keep in mind. One is that in those situations where the judges learn something new, and that has given him or her a reason to increase the sentence from the pretrial offer. Usually what that means is that there's going to be an incremental increase in what that offer was. Here, this is obviously it's not an incremental increase, it's nearly triple what the judge offered during the pretrial hearing. And on this record, it's clear that what we're really dealing with is a trial tax. What we've got here is a unique situation where the judge at sentencing is saying that he's giving a hundred year sentence, primarily because of the seriousness of the offense. Yet, when we look at this record, during the pretrial proceedings, by the time that 402 conference had, the judge already had a very detailed understanding about just how serious these offenses were. And I'll direct the court's attention to the motion to reconsider bond hearing that the court presided over back in 2015. If you'll recall, at that point, Daniel was on a no bond hold from bond court. Daniel filed a motion to reconsider that bond, and since the state wanted to keep that no bond hold, the court heard from the state a very extensive proffer about the facts and details of the case. Starting from the point where Daniel was at the gas station and gets into the car and drives off, through the details of the sexual assaults, the multiple acts of aggravated criminal sexual assaults, learns about the threats that he made, saying that he had a gun, that he was going to kill the victim's date, that Daniel was part of a cartel. The judge knew about the fact that he then drove her back to the south suburbs, made her take money out of her bank account. He took that money. He knows that the judge knows that Daniel had then taken the car. The judge also heard about the fact that there was a outcry, that there was a sexual assault kit that was performed, that there was a positive. Do we know whether the judge at the 402 conference was apprised of the defense theory of the case, that it was a case of consent? I don't know for sure, Your Honor. I'd have to go back and look to see when the affirmative defense of consent got filed. My recollection is he probably would have been, because if I remember correctly, what happened was that the 402 was conducted by the public defender who had been representing Daniel shortly before trial began. And at that point, my recollection of the record is correct, that an answer had already been filed and it had that consent defense. And is it true that there were two hearings on the motion to reconsider? It's true. So you can assume we're very familiar with the briefs and the record. I want to sort of talk to you more theoretically about the notion of trial penalty. There's a debate in the academic world about whether the disparity should be a trial penalty or a incentive or discount to plead guilty. And there's lots of papers out there discussing it, lots of analytical studies. I'd like to hear from you on how you distinguish a incentive to plead guilty from a trial penalty. Is there a particular test that's to be employed? We're familiar with the Dennis case. We're familiar with the court's holding there that in addition to overt statements that a judge might make, suggesting that he penalized a defendant for exercising his right to trial, that a large disparity can also form the basis of an inference. And in the Dennis case, it was a 20 times factor. Here, it's not 20 times, and you're probably familiar with cases where courts have said, well, it wasn't 20 times like in Dennis, so therefore there was no trial penalty. We recognize here that this is a de facto life sentence. So how, in your view, do we decide this case if we're to decide it in your favor? Is there a test we employ, or how would you advocate that we decide this case? Well, there is no, to my knowledge, there is no specific test that the case law sets forth that this court employs. With that in mind, what I would say for this court to decide in our favor is to simply look at this record in its totality. This is sort of a unique circumstance. It is, it is. And on these facts, we have a very unique situation where there is undeniably a significant difference between what was offered before trial and what was ultimately the sentence. I realize it's not a 20 times increase, and it's hard to reach a 20 times increase, both because Dennis preceded determinate sentencing, because there are caps on what the maximum statutory maximum was for these offenses, and things like that. So I don't know that you're ever going to find a 20 times increase, and I don't know there's a bright line rule either about there being, if it's X times above what the judge had offered before. That's why it seems to make the most sense, given the case law that we have, and the general principles that guide those decisions, that we need to be looking at the facts here. We know from the facts that we're familiar with the facts. Yeah. Are you familiar with a case that was decided. Subsequent to briefing in this case called people versus Walker in the fourth district. There the appellate court express skepticism, Dennis found that it's reason which reasoning was shaky. You have any like you'd like to tell us about that case. I'm not familiar with Walker so I don't have anything I can tell you right now. If there's more that this court would like to know from us about how Walker might impact Dennis or our, our excessive sentencing argument I'd be happy to provide a supplemental brief addressing Walker directly but unfortunately I'm not in a position to be able to directly comment right now. In terms of a trial text I have another sort of philosophical question which is, in addition to learning more facts, the case, the trial judge saw the defendant testify in testimony that the trial judge clearly found not just perjurous but ludicrous. What's the role of that in terms of proper consideration of that. I acknowledge that that if, since the judge essentially made a credibility adverse credibility finding about Daniel, that can be a basis for increasing the sentence. What doesn't change is that it provides a basis for an incremental increase in sentence. And what we have here is anything but an incremental increase. So that's I think an important piece of this discussion here is that I'm not disputing the fact that the judge could and had some basis for saying, I know more now. And those additional pieces of information for me are additional aggravation that allow me to impose a sentence that's greater than what I offered before. But even when you take all of those things in their totality, it still should only get to a sentence that incrementally increases what he had offered before and going from a sentence that would allow Daniel to be released. When he was probably in his late 50s is far from a death in person sentence, and that that's not incremental. So that I think that would be my response to your question, Your Honor. And Mr. Daniels, I'm going to take you back to Justice Taylor's question really quickly regarding Walker and Walker. That was a case where the state had offered probation. It was a child sex case and ultimately defendant was found guilty and just sentencing to 35 years. And basically what the court held was that the judge was not involved in negotiations of that case and therefore really wasn't bound by anything. So you want to respond to how you see that case is just being totally different. Also, just as Justice Taylor mentioned, Walker also questioned whether or not Dennis was even correctly decided. Yes, Your Honor. It's again, I'll preface this with since I haven't read this case, I don't want to speak as if I can. There may be nuances here that I don't know, but from what you're describing to me, Justice Walker, if you're dealing with a situation where the pre trial offer didn't involve the judge in the 4th District Walker case. That sounds different than what we have here because we have a 402 conference here where it's pretty clear that the judge was involved. If you look at the record here, you see that the state was offering 40 years to dispose of this case on the four counts that ultimately went to trial. At the 402 conference, the judge offers 36. Your argument is that the judge believed 40 years was excessive, huh? At the time, yes. And I agree, to go back to Justice Smith's question, even Justice Taylor's, I understand that. So you would acknowledge though when the judge came up with a 36 year recommendation, he factored in an incentive, right?  But your argument is that it can't all be an incentive, right? The difference between 36 and 100 years can't all be accounted for by an incentive. And some part of that difference is a penalty. That's your argument. I think that's right, Your Honor. You can have both of those coexisting. But when you have this kind of disparity of 64 years, what we have here is even if we factor in that incentive, factor in what Justice McPhill was talking about regarding the adverse credibility determination, add in the additional context that the judge may have received in the trial testimony or the victim impact statement, put all that together. That still doesn't explain how the judge gets to 64 years here, particularly where you have someone who we know is intellectually disabled. And we know from the case law that folks who are intellectually disabled are categorically less culpable. So let's pivot to that argument because that's another basis of your appeal, that the judge did not sufficiently or adequately consider your client's intellectual disability. And in the record, the judge indicated that there are some records that they were 14 years old, that there's not been any live testimony. That might suggest that he disregarded intellectual disability. And so, my question to you is, our Supreme Court has held that it's double-edged sword, right? While statutorily, intellectual disability is a factor of mitigation, our case law recognizes that it also may be a basis to impose a longer sentence because the intellectually disabled person might be more prone to commit crime in the future. Is it your argument that because the circuit court didn't address the question of intellectual disability, that that's the basis for remand? In part, and additionally, to get to that double-edged sword part of intellectual disability, this is not a case where the judge says that the reason he's imposing a 100-year sentence is because of future dangerousness concerns or that Daniel lacks any potential rehabilitation. Those are two pathways to using features of intellectual disability as aggravation for increasing the sentence. But here, when we look at the judge's findings when the sentence is imposed, he's relying strictly on the seriousness of the offense. So, to the extent that those other possible ways that intellectual disability can otherwise sort of be a backdoor route to aggravation, we don't have that here in this record based off of what the judge said. I have one follow-up to that, which is, because there was evidence of intellectual disability in the record, we have to presume, do we not, that the trial judge did take that into account, and properly take that into account, unless something rebuts that. I'm asking if anything does rebut that presumption. The 64-year add-on to the 36-year offer is the evidence that rebuts that presumption. So you look at those two together. Yes, Your Honor. So, Counsel, would any of your arguments change if the judge had doubled the sentence and given him 72 years, or if the judge had given him half of the, increased it by half and given him, say, 54 years? How would your argument here change today? That's a difficult question to give a real definitive answer to. My intuition is that a 72-year sentence would put us in the same boat, because that's essentially still a death in prison sentence. 54 may still be close to that line. I would suggest that, since our position is that there was a basis for an incremental increase above 36, something that was in the range of probably anywhere between 5 to 10 years would certainly be within the judge's... The sentence that was recommended at the 402, would that be a fair characterization? On this record, yes, Your Honor. That's a fair characterization? On this record, yes, Your Honor. Okay. One last quick question. Am I, are we correct that Judge Sheehan, who was a child judge, is no longer, has retired? Is that correct? No. That's my understanding, Your Honor. Okay. Anything else? So we don't need to move to a vote time? Is there anything else you would like? No, Your Honor. I'll stand on the briefs at this point and preserve the rest of my time for everybody. Thank you. Counsel. Good afternoon. May it please the court. As I said earlier, I'm Assistant State's Attorney Lisa Morrison on behalf of the people. If it's, if Your Honors are okay with that for now, at least I'll start with addressing the issues that you've brought up with counsel for the defendant, specifically regarding this issue of the excessive sentence and specifically the allegation that this was a trial tax. Are you familiar with the Walker case? Have you seen it? I am just like counsel said, I am unfortunately not. So I'm in the same disadvantage that he is, though I heard Justice Walker's kind of recitation of what it's holding was. So unfortunately, we're both at the same disadvantage of not being able to give you a good discussion of that case. So I apologize for that. Well, I'll share with you, I'll share with you that I'm not entirely clear on the rationale of the case, because although the court says a number of times that, you know, the trial judge is not involved in a 402 conference, then it cannot be a, you know, you cannot characterize a sentence as a trial penalty. The court never actually indicates whether the trial judge in that case was involved in a 402 conference. I don't really know what the rationale is, but you folks will look at the case. We will, I'm sure as soon as this is over. That's the first thing we're both going to do. So I think in the context of a trial text, the way that I would that I've looked at it while preparing for this and writing the brief was there's a difference in giving a defendant an incentive to plead guilty to reduce the burden on the trial system, the trial court system to spare a victim, especially a victim who we obviously see through this record suffers from post traumatic stress disorder from the attack. And from her having to come in and face the defendant in court from using resources from all of these different people and our jurors coming in to handle the case. So there's a difference, I think, though, in providing him an incentive to acknowledge his wrongdoing, which I think arguably goes to his potential for rehabilitation, his ability to have said this is on me, I shouldn't have done what I did. And I'm going to take my time for it. I think the judge, the judge has the right and should give an incentive to defendants who want to acknowledge wrongdoing where they're willing to do that. But I think there's a difference in giving also recognize that you also recognize that someone who takes a plea isn't necessarily acknowledging wrongdoing. They're just playing the pros and cons of going to trial. Correct. And I think there are some defendants, though, that when they do plead guilty, obviously it is because they are guilty and they know that the evidence is going to show that, you know, and they may give a statement and allocution to that effect that they are taking their time because they are acknowledging the harm done. But I think the most important thing to notice is there's a difference in giving the defendant an incentive and punishing him for exercising his constitutional rights. And so giving him an incentive to plead guilty to especially in a case of this kind of trauma that was inflicted to avoid the trial process. I think that's why the state may offer something as low as they did in this case, because the state obviously has an incentive to make a lower offer. And typically, as your honors know, a 402 offer from the trial judge is typically lower than the offer that's made by the state's attorney. It gives the defendant the opportunity then to gain something by the bargain to get some benefit from doing the 402 conference. And so I think it's important to note there's no evidence in this record that this is. Morrison, is it my understanding your argument here to be that the incentive here was greater than might normally be the case because this was a sex related crime and it would impose substantial trauma on the victim to testify. Is that the position? I think that it's hard to give a position where the judge wasn't given an opportunity to make a record on this because there was no motion to attack the sentence. So we don't know what Judge Sheehan's reasoning was. But I do think in a case like this, it's reasonable from this record to assume that the state's attorney made a relatively low offer for given the egregiousness of this crime for a reason. And that the trial court then accepted that and undercut the state to some extent to give the defendant the benefit of his bargain to give him an incentive to plead. We cannot say on this record why exactly the offer was what it was from the state or from the trial court because we don't have that. We can only presume from the circumstances on the record that this would be, in my opinion, a reasonable explanation for why the offer was what I would consider pretty low going into the 402 conference from the state's attorney as well as then lower. Would you acknowledge that when the, and I know there's no record as to the trial judge's thinking when he made the recommendation, but would you acknowledge as a general matter, when a trial judge makes a recommendation at a 402 conference that he would, by necessity, have to consider the seriousness of the crime and trauma and harm caused to the victim? I would think however much of that he was made aware of, he would have to consider. And you acknowledge that here the trial judge was made aware of the salient facts that the state intended to prove? I have no reason to doubt that given, as counsel pointed out, the bond hearings and things that took place on this record. And then would you finally acknowledge that the trial judge's recommendation would reflect the seriousness of the offense? I think it would reflect it to the extent that he's able to comprehend it at that point. I think this case shows through the judge. Let me just stop you there. Yes. I think that he did comprehend it to that point. We have an experienced trial judge. It's not, you know, his first go around. What's that? I mean, I've heard from any trial judges at 26th Street that, you know, the trauma that they hear about on a day in and day out basis is mind numbing. So we're not talking about any babe in the woods here. Would it be fair for us to assume that based on what the state advised the trial judge of that he had a pretty good sense of the brutality and heinousness of this offense? I think he would have had to have known a good portion of it. I don't know if he had quite a visceral picture of it. I think there's something different of hearing it first person from the victim's own mouth, watching her emotion and watching the emotion of the other people who interacted with her afterwards, seeing the photographs. We don't know if the judge saw the photos of injuries, heard about the medical testimony. We don't know how much of that the judge was aware of. Obviously, we know the judge knew that there was enough information to support the four different counts, the various types of penetration that we're dealing with, with the aggravated criminal sexual assault counts. So we know he knew the facts of that. Do you acknowledge that the counts that were discussed at the 402 are the same counts that were tried? I don't recall that specifically from the record that it was clear that these were the exact counts. Do you have any reason to doubt that? I don't. I mean, there are circumstances where the state's attorney will make an offer to go forward only on one count. That's typically in a sex case where two counts is going to be mandatory life. There may be some movement on the counts. I have a feeling that it was probably the same, but I can't specifically recall from this record. So, Mr. Daniels argues that, you know, the case here is not your typical case. It's a case where there's a very large trial sentencing disparity, and that the actual sentence bears no resemblance to the 402 offer or recommendation, and therefore, we ought to reverse on that basis. How do you respond to that? I don't think that it doesn't bear a similarity to it. No matter how many years, if you're talking already 36 years and beyond, no matter how many years we're talking about, we're not talking about the difference of probation versus, you know, a decades long sentence. We're talking about decades in prison, and the reality of it being that this defendant, regardless, is either coming out of prison as an older man, quite older, or he's not coming out. I mean, but the reality of it is we're talking about a sentence of years. I don't believe that even though it is quite a difference, the reality of life expectancy, a hundred year sentence, doesn't really change the outcome for him versus even the 36. He was not a particularly young man at the time of this offense. Wait a second now, because he was 27 years old. So your position would be, even if the court had sentenced him to the maximum of 120 years, that still would not be a great disparity from the 36 years, because you just said you don't believe a hundred years is such a great disparity. At least that's how you started. I don't think that we're talking about a disparity like probation versus versus a life sentence or probation versus even incarceration, which are obviously two very different things. So, and you believe that that's the only time that there's a great disparity such that this court should respond is that there has to be probation and then some extended sentence. There's no other situation. No, I don't. I think as counsel said, every case is case by case. I don't think we can make a blanket rule one way or the other of what amount of doubling or tripling or 20 times the difference. I don't think we can make a bright line rule to say how much more it needs. What about what about our constitution's requirement to restore people to useful citizenship. It's true. I think in this case, we need to look at the fact that the sentence was well within the range. There were 20 years that weren't tacked on by the judge. He specifically mentioned that. I mean, it's presumed proper because it's within the range. Right. This judge followed all of the requirements and did give due consideration to everything, including 1 of those factors that being the rehabilitative potential of the defendant. So, given given all of that, do you believe that the trial judge use the. I'll just say mental health issues as a mitigating factor as an aggravating factor. I don't think that we can say from this record, but I don't believe this record gives any reason to believe he used it against him, even though Cody says he could. I don't believe this record shows that he in any way. Consider this defendant's mental disability in any way against him. I think he did consider the way the defendant testified and what he testified to against him, but I don't believe. I think that that was particularly insulting to the judge. He mentions that quite a bit about the defendant's story, his version of events. As he thought he was the smartest person in the room and so right. And I think even the greatest storyteller on Earth, if they had told the story, he did. It just doesn't hold water considering the other evidence against the defendant. The delivery isn't really the issue, but he did have an answer for everything, which is, I mean, that's a defense. He's got he's forced by the DNA evidence in this case into a consent defense. What else is he going to do? And so this is the way it went, but I believe the trial court after hearing from the victim who obviously was compelling based on how he responds to her. She's propelling and then he gets up and tells a story blaming her for her own sex assault that she wanted it. She wanted to then pay him. She wanted to give him a car. I think the judge was insulted by it. I think he found it to be perjurous and not judging him. Can I ask you a question about that? The testimony of the defendant here, the judge determined was essentially ludicrous. And, you know, there's a good basis for that. But could that any of that be accounted for by his intellectual disability? You know, the fact that, you know, the judge observed that he thought he was the smartest person in the room. This is the same guy who said he was with the cartel, that the cartel was sent, you know, to kill her, that John, the cartel threw him in a trunk. And, you know, there wasn't any evidence that any of that was true. There was, you know, defendant supposedly told the PSI investigator that he was a high ranking member of the leader in the maniac disciples, I think gang. I don't know that there's any other evidence that that was true. It seems like this guy will say anything. And, you know, it sort of begs the question. Is this guy really as cunning as he seems to be to the trial judge or is he just so intellectually disabled that, you know, that that could account for his testimony and also his behavior. Because some odd behaviors, you know, after he rapes her three times, he's stroking her hair and telling sharing his life story with her. And it just seems very odd. I think it's important to notice in this case, specifically, the defendant gave a statement as to the issue of was he that cunning and is he just not able to come up with a way to defend himself in a believable way. This defendant is the same person who told the police when he was arrested that this is his girlfriend. She gave him the car and they didn't have sex. So he knew and was able to understand what was going on, that he was being investigated for this. I think that's probably, you know, he was evaluated for sanity and obviously that didn't go anywhere in his favor. So that was not able to be explored as a defense. But this is the defendant who was able to come up with the smartest thing he could have said to explain away all of the circumstances that looked really bad for him at the point he gets arrested. He's driving a car that's been reported stolen by a rape victim, and she's making allegations that he sexually assaulted her. And he tells the police immediately, no, no, no, that's my girlfriend. She gave me the car and she we didn't even have sex. They're like, you know, there's going to be DNA. And he said, OK, we had some sex and he is able to evolve his story to fit what he's being confronted with. I think that bears a lot on his ability to communicate. I think it's also kind of analogous. If you look, trial counsel initially requests from the public defender's office had the defendant evaluated for sanity. Both counsels talked about knowing he had the BCX done. Neither counsel ever requested any sort of fitness evaluation. The issue would be, is he able to communicate with them and able to help in his own defense? These are two separate issues, right? When we're talking about intellectual disability, we're not talking about whether he's sane. No, sorry. What I was trying to explain was, if you look at the record, neither defense attorney ever indicates to the judge that they're having some sort of trouble having conversations with the defendant. If the issue is that he'll say anything and he's not or he's not taking it seriously, he's making up that he's a gang leader, whatever it might be. The record doesn't bear out that either counsel had trouble communicating with him in the way that is being alleged on appeal. It's presumed everyone believes that he told the story in a terrible way and that he delivered it in a really incredible way, not just on its substance, which is unbelievable in and of its substance. The reason I brought up the idea of a fitness evaluation is that would be a clue to this court that trial counsel found him hard to communicate with. He would be unable to assist in his own defense in a meaningful way that he would be unable to communicate with them. The record is absent that either defense attorney ever had any concerns about the defendant's ability to convey information or convey information to this jury. So we're presuming based on the arguments put forth by the defendant on appeal that he was convicted because of his credibility issue and that he has that he presents a certain way that we really don't know if he did based on the record that's before us. The story itself is implausible. It doesn't matter how you tell it is what I'm getting at. Even if you were a great communicator there's no reason to believe this story would have held water, but the facts of it kind of forced him into giving this story there's there's not a lot you can do from a defense perspective. When you are confronted with DNA evidence and he's caught with her car. Let me ask you a different question. Can you pinpoint for me and I don't know, Paul I'm sure it's in the record, where exactly the trial court is advised to his low IQ. So I know that both trial counsels before the trial told the court he was on SSI. So presumably that they were all aware at that point there was some disability. And then it's when those documents were purportedly recovered by the family in some unknown fashion. After the trial that they found these documents from when he was a teenager and had been evaluated at school, and for social security. When those were tendered to the court post trial I believe is the first time we got an actual number. But were those also brought again to his attention at sentencing or was it. I believe counsel did cite to all of those documents again at sentencing, and the court did say at sentencing that counsel has presented some mitigation. That's really the only thing. Is the trial court make clear exactly what he was referencing. No, there is not a specific quote from the trial court as to what he, he does say though that also did put forth I believe his words were some regarding mitigation when he after he says that he is considering all the factors statutory factors and aggravation and mitigation that he's taking into account the PSI with all of its additions and deletions that were made. And then he does say counsel put forth some I think is his language that he uses. But again, we don't have a motion to reconsider the sentence to give him that opportunity to really explain where he was going with it. He made his record that he was within the statutory range that he was considering everything he's required to consider. And then we never get to hear from him again as to all of his reasons he more went through the facts of the case and the PSI, and just kind of regurgitated the evidence he had heard, but there's nothing in the record then to say he was holding defendants disabilities, whatever they may be against him, or, or anything of that nature. Your time is up but if anybody on the panel has any further questions. I think we'll say yes. If you have a final point you want to make I have just that, for the reasons that I've stated in the brief, and the ones we've discussed today, we'd request that this court, affirm the defendants conviction and sentence. Thank you. Your Honor, it's just a couple of brief points I want to make and then if there are any other questions the court has I'm happy to answer those. First, to build on a point that Justice Taylor brought up a couple of minutes ago, the, there are those statements that the judge makes during sentencing about the testimony of Daniel, and making remarks that he thinks he's the smartest person in the room. Our position is that that does create concern that that was an improper use of his intellectual disability and aggravating the sentence and that that's also in part and parcel with why this sentence was an abuse of discretion and excessive. Second, the one other let me ask you very quickly. Is that a characteristic of an intellectually disabled person that he might think he's the smartest person room that he might think that he could could link everybody. Well, from what we know about intellectual disability one of the adaptive living deficits that one can have is having speech and language deficits, as well as having an improper affect that's congruent with the surroundings in which you're speaking. Daniel had both of those, we know that from those records that were in the motion for new trial so I think that's a fair nexus between those characteristics of intellectual disability and Daniel's presentation track during his test. What about Miss Morrison's argument that, you know, Mr. Garcia is smarter than he claims to be because he was adapting his story, you know, as the investigation went along, when he was questioned by the police for example, you know, you respond to that. Well, it shows that he's has an impulsive streak and will wants to be pleasing to others, which is another characteristic intellectual disability. I recognize that there may be a reason to look at this record and see that there are different ways to look at that statement from the judge about Daniel being the smartest person but it's still our position that there's there's a real concern based on the totality of this record that was being used improperly. And that gets me to the other point I want to highlight the one other piece of the record that we haven't talked about that I think is important to remember when thinking about why there's this disparity and being a trial tax a punishment for going to trial is that this record is clear that by the time of sentencing the judge had a real displeasure with the defense. Daniel was supposed to go to trial in September, or I think October of 2016, a couple days before trial. He has the private lawyer who ends up being trial counsel come in the judge why they still go to trial in October and that's so you know you pointed out in your reply brief examples of what you say are the trial judges frustrations with Mr. And from that you infer that he took it out on Mr. Garcia at sentencing. I mean you, you acknowledge would you not that in any trial there's going to be moments of tension between the trial judge and counsel. And what is it about this case that makes it exceptional. There are moments of tension in any trial won't deny that but on this record I think this this court has had enough experience in reviewing trial records to see that the antagonism here was something out of the ordinary, that there was a constant source of friction that was created by virtue of the decisions and the choices, the council did or didn't make. Particularly once the trial starts, or actually even a little before when they were litigating the pre trial motion on the rape shield statutes to all the way through to sentencing that there was just a series of things that trial counsel did or didn't do that raised the peak of this judge, and it was a source of unending frustration. So unless there are any other questions from your honors. For the reasons that we set forth in the brief, we would ask this court to either grant Daniel a new trial, or to grant some sentencing relief. Thank you both for excellent briefs and arguing your sentence.